**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David CARO, Defendant-Appellant.**

**No. 77–5261.**

United States Court of Appeals,
Fifth Circuit.

March 10, 1978.

ators, Daniel Mizer, Sammy Self, Elias Casillas, and Timothy Trail. The jury acquitted Caro on a substantive count of possession of heroin with intent to distribute, 21 U.S.C. § 841(a)(1). On this appeal, Caro challenges the sufficiency of the evidence against him and the use of alleged hearsay evidence by the government, and asserts the denial of his rights under the due process and confrontation clauses to cross-examine witnesses against him. Finding all the arguably admissible evidence introduced by the government insufficient to support Caro's conviction for conspiracy, we reverse.

### The Facts

Viewed in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the facts are as follows. On September 14, 1976, two special agents with the Drug Enforcement Administration (DEA), acting in an undercover capacity, initiated negotiations with one Daniel Mizer for the purchase of a quantity of heroin. During those negotiations, according to the testimony of Special Agent Wendt, Mizer stated that he would talk to his "source of supply" and arrange delivery of a one ounce sample of heroin. Another meeting was held the following day at Mizer's residence; at that time Mizer apologized to Agent Wendt for his failure to appear at a pre-arranged rendezvous, explaining that he was out looking for his source of supply. On September 17, 1976, the agents agreed to meet with Mizer at his residence to purchase a one-gram sample of heroin. The meeting was held that day; in addition to the agents and Mizer, one Timothy Trail was also present. Mizer told Agent Wendt that he would go to the house of his source of supply, that the house was approximately five minutes away,[1] and that he would inform his source that the agents were ready to purchase the one-gram sample.[2]

Robert R. Harris, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., San Antonio, Tex., Frank Walker, Stanley M. Sewatka, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before THORNBERRY, GOLDBERG, and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

Appellant David Caro was convicted after a jury trial on one count of conspiracy to possess heroin with intent to distribute, 21 U.S.C. § 846, and sentenced to fifteen years' imprisonment, to be followed by a special parole term of twenty-five years. Caro was tried independently of his named coconspir-

---

1. The government's theory is that Caro was the "source of supply." Agent Wendt testified on cross-examination that Mizer's residence at 3020 Wedgewood was not in the Ysleta area of El Paso in which Caro's Coloma Circle address was located.

2. When these statements made by Caro's alleged coconspirators were introduced at trial

Following Mizer and Trail's departure, one David Wilson, not named as a coconspirator, arrived at the Mizer residence. Upon Mizer and Trail's return, ten to fifteen minutes after they had departed, Mizer informed the agents that everything looked good for the transaction. Shortly thereafter, Elias Casillas and Sammy Self arrived at the Mizer residence. Mizer, Trail, Self and Wilson entered the house; Casillas remained in the car and the agents waited outside. A few minutes later Wilson left the house and handed the agents a one-half-gram sample of heroin. Arrangements were then made for the purchase of eight ounces of heroin. Self told the agents that he and Casillas would leave to meet the source of supply at a bar in the lower valley, where the supplier was waiting with eight ounces of heroin.

Surveillance agents followed Self and Casillas to a market, then to the Flying Y Bar in the lower valley area. After a short stay, Self and Casillas proceeded to a house located at 8774 Coloma Circle, where one of them, standing outside a fence surrounding the house, spoke briefly to a short, stocky man within the fence.[3]

Self and Casillas then returned to the Flying Y Bar. Meanwhile, Wilson, in the company of Agents Wendt and McLees, received a telephone call from Mizer stating that Casillas and Self had missed their meeting at the bar with their source of supply and were still trying to locate him. Wilson and the two agents returned to Mizer's residence, where, after some discussion, the transaction was postponed and set for the following day.

Some time later, still on September 17, Agent Wendt learned from an informant that Self and Casillas had located their source of supply and that the supplier had eight ounces of heroin and wanted to complete the transaction that evening. Casillas outlined a detailed plan of operation for the transaction to Agent Wendt. Agents Wendt and McLees were to go to a root beer stand located in the lower valley area of El Paso County, a location selected, according to Casillas, because it was only a couple of blocks from the source's house. But this plan, too, was to change. At a meeting that evening, Casillas and Self told the agents that their source did not want to "do the deal at the [root beer] stand because it was too close to the source of supply's house."[4] Agent Wendt first indicated that he intended to proceed with the original plan, but then agreed to an alternative plan in which the supplier would bring the heroin to the agents at Casillas' house. Casillas and Self then departed.

At about 9:00 p. m., Self met with the agents and stated that his source of supply was on his way to Casillas' house, located at 130 Candelaria. The agents, accompanied by Self, then drove to that address, parked

---

through the testimony of DEA agents, defense counsel objected "to all statements made by other parties to the officer as being hearsay." The trial judge instructed the jury as required by *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), that the jury was not to consider such hearsay testimony until it was satisfied by separate, distinct, and independent evidence, not hearsay testimony, that a conspiracy had been formed and that Caro was a member of that conspiracy. Defense counsel indicated his satisfaction with the *Apollo* charge and did not raise, at trial or on this appeal, the question of whether *Apollo* survives the applicability of Rule 104(a) of the new Federal Rules of Evidence. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). On a review limited to plain error, this court has determined that the traditional standard passes muster. *United States v. Ochoa*, 564 F.2d 1155, 1157–58 and nn. 2, 3 (5th Cir. 1977).

In view of our determination that even if considered admissible, statements made by Caro's alleged coconspirators during the course and in furtherance of the conspiracy, coupled with other admissible evidence, do not provide sufficient evidence to sustain Caro's conviction, we assume without deciding that such statements were properly admitted at trial. Accordingly, we need not pause further in our recital of the facts to specify which evidence was admitted under the coconspirator exception to the hearsay rule (or the reformulation of this standard under Fed.R.Evid. 801(d)(2)(E)).

3. Medical testimony established that in October of 1976, Mr. Caro's height was 67 inches and weight was 261 pounds.

4. An electric bill in Caro's name, located later, indicated a Coloma Circle address within several blocks of the root beer stand.

across the street, and remained in their vehicle. Upon arriving they noticed a 1971 green Chevrolet parked on the street in front of the house. Casillas approached the agents in their vehicle and informed them that the source of supply had only five ounces of heroin. The agents agreed to purchase that amount and Casillas left the agents' vehicle and walked back to the green Chevrolet, entering on the right passenger side.[5] A short time later, Casillas returned to the agents' vehicle, told them that everything was ready, and asked whether the agents would follow him and his source of supply to a bar on North Loop where the five ounces were waiting. The agents stated they would not leave their present location and insisted that the heroin be brought to them. Casillas responded that he would have to talk to his source. Casillas then walked back to the Chevrolet and the vehicle departed.

About twenty minutes later, Casillas returned, driving the same 1971 green Chevrolet. Casillas was accompanied only by a young child. Agent Wendt entered the Chevrolet and was handed a brown paper bag containing approximately five ounces of heroin. A signal was given and Casillas and Self, who had been waiting with the agents for Casillas' return, were arrested. Following the arrest, Agent Wendt searched the Chevrolet and found several electric company bills in the name of appellant David Caro, bearing addresses of 10229 Hachet Street, El Paso, Texas, and 8774 Coloma Circle, El Paso, Texas, as well as a work order for a 1971 Chevrolet, also bear-

ing Caro's name.[6] Casillas was advised of his constitutional rights and interviewed by Special Agent Theodore Baden. Agent Baden asked Casillas to whom the heroin belonged, where he was supposed to take the money received from the undercover agents, and to whom the automobile belonged. He also asked Casillas whether he would take the agents to the place and the person to whom he was to pay the money.[7]

Following this interview, Special Agents Wendt and McLees entered the 1971 green Chevrolet together with Casillas and proceeded in convoy with surveillance agents to 10229 Hachet Street. Upon their arrival at that address they observed a white male walk down a driveway, whistle, and make a motion for the vehicle to stop there. Agent Wendt got out of the vehicle and chased the male, who ran up the driveway and into the residence, closing the door behind him. Agent Wendt knocked at the door but received no response for two minutes. Two women, who identified themselves as David Caro's wife and mother, opened the door and gave Agent Wendt permission to search the residence. A search of the house and the surrounding neighborhood failed to locate Mr. Caro.[8] At trial, Agent Wendt identified Mr. Caro as the person who had been at 10229 Hachet Street and had run through the door.

## Sufficiency of the Evidence

· This court has had several recent occasions to address the essential elements of a criminal conspiracy. These elements in-

---

5. Neither Agent Wendt nor Agent McLees, in the vehicle across the street, could testify that a second individual was present in the green Chevrolet during the course of this transaction. A surveillance agent driving by sometime during this period saw a heavy set man, similar in size and statute to the appellant but not further identifiable, sitting behind the wheel of the green Chevrolet.

6. The record does not disclose the ownership of the Chevrolet or of either residence. Caro's mother lived at the Hachet Street address.

7. The record does not indicate whether these questions were answered. The status of this testimony is evaluated *infra* at note 10.

8. This account of the events at Hachet Street was controverted at trial. Only one of the agents purported to identify Caro at the scene or to observe his flight, while Caro's mother testified that Caro was not present. Evidence of the physical characteristics of the setting and of Caro's medical disabilities was also introduced to negate the possibility of Caro's flight and escape. Viewing the evidence in the light most favorable to the government, as we must in a sufficiency case, we credit Agent Wendt's testimony that Caro was present and took flight.

clude "an agreement to commit a crime followed by an overt act in furtherance of the agreement." *United States v. Gutierrez*, 559 F.2d 1278, 1280 (5th Cir. 1977). "There must be proof beyond reasonable doubt that a conspiracy existed, that the accused knew of it, and that the accused, with that knowledge, voluntarily became a part of it." *Id. See also United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977), cited in *Gutierrez*. The crucial issue for our determination here is whether the government has carried its burden of proving beyond a reasonable doubt that appellant Caro knowingly participated in the conspiracy established in this case.

■ Appellant moved for acquittal on the ground of insufficient evidence at the close of the prosecution's case-in-chief. The motion was renewed at the close of all the evidence. The standard for review in such circumstances has recently been stated by this court:

> [I]f the trial or appellate court is satisfied that the jury could not reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt then the trial court, or on appeal, this Court must hold that "the jury must necessarily have had a reasonable doubt as to the inconsistency."

*United States v. Haggins*, 545 F.2d 1009, 1012 (5th Cir. 1977), *quoting United States v. Nazien*, 504 F.2d 394, 395 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975). *See also United States v. Pinner*, 561 F.2d 1203, 1207 (5th Cir. 1977). The standard is further explained in *Barrera, supra* :

> In a criminal case the Government must prove every element of the offense be-

yond a reasonable doubt. In this respect, circumstantial evidence is intrinsically no different from direct evidence, . . . and the same test for judging the sufficiency of the evidence should apply whether the evidence is direct or circumstantial. . . . Therefore, in testing the sufficiency of the evidence in this circumstantial evidence case it was the duty of the trial judge, before sending the case to the jury, to determine whether a reasonably minded jury *must necessarily entertain a reasonable doubt* under the evidence.

547 F.2d at 1255 (citations omitted; emphasis supplied); *quoted* in *Gutierrez, supra*, at 1280. We view the evidence in a sufficiency case in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ As we have noted, *see* note 2 *supra*, much of the government's evidence produced at trial and incorporated in the recitation of facts above was objected to at trial as inadmissible hearsay. As to those statements made by Caro's alleged coconspirators during the course and in furtherance of the conspiracy, we need not determine, in view of our ultimate decision on the sufficiency question, whether the evidence was properly before the jury at trial; we assume without deciding that such evidence may be considered as part of the government's case. We do not, however, indulge this assumption as to certain statements made after the termination of the conspiracy and not in furtherance of any of its goals. Such statements are plainly inadmissible hearsay, could not have been considered by the jury below, and cannot be considered as part of the government's case on appeal.[9] We are also unable to accord

---

9. At one point in his testimony, Agent McLees, referring to the period after Casillas' arrest when Casillas, McLees, and Wendt were proceeding to one of the addresses indicated on the electric bills, stated "at that time we were trying to find the location of Mr. Casillas' source. It was pointed out by Mr. Casillas and we stopped the vehicle." Tr. 97. It is plain that assertive conduct, like an oral declaration, is subject to the hearsay rule. Fed.R.Evid. 801(a)(2). Mr. Casillas' "pointing out" consti-

tutes such assertive conduct. *See, e. g.*, 11 Moore's Federal Practice § 801.01[3.–1] (2d ed. 1976). Coming as it did after Casillas' arrest and the termination of the conspiracy, and serving no conceivable purpose of the conspiracy, this assertive conduct is not excluded from the definition of ·hearsay under Fed.R.Evid. 801(d)(2)(E); it is also inadmissible under the traditional coconspirator exception to the hearsay rule. We cannot regard this assertive conduct occurring subsequent to Casillas' arrest as

much weight on our review to other evidence which, while arguably outside the realm of technical hearsay, can only be taken as supporting the government's case on the basis of inferences too speculative for a reasonable jury to have accorded them much weight.[10]

Thus qualified, our careful review of the record reveals only the following elements touching upon Caro's knowing participation in the conspiracy: (1) Documents with the name David Caro were found in the 1971 Chevrolet in which Casillas was arrested. (2) Surveillance agents observed a conversation between alleged coconspirators Casillas and Self and a short, stout man (a description matching these characteristics of Caro) at 8774 Coloma. (3) A man, not indentified but perhaps Caro, was present in the 1971 Chevrolet in front of Casillas' home. (4) An

part of the res gestae of that arrest, nor do we find any other exception to the hearsay rule which would justify admission of this statement.

While this particular evidence was not specifically objected to at trial, defense counsel had earlier objected to the introduction of alleged hearsay testimony concerning statements by coconspirators. In response to the earlier objection, the trial judge instructed the jury as required by *Apollo, supra,* 476 F.2d 156. This charge was clearly intended to have a continuing effect with respect to all coconspirator hearsay testimony elicited at trial. The charge was also reiterated by the judge in his final instructions to the jury. As McLees' testimony concerned hearsay declarations made after the termination of the conspiracy and not in furtherance of any of its goals, the jury, in accordance with the judge's instructions, must have disregarded it. We note that the government *does not rely on this evidence in its discussion* of the sufficiency issue. Nor may we place any reliance on this testimony in assessing the sufficiency of evidence supporting the conviction.

In view of our determination on the sufficiency issue, we do not reach the appellant's contention that admission of this testimony in itself constitutes reversible error under *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). *See Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974); *cf. Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) (non-hearsay actions).

**10.** Agent Theodore Baden testified as to events following the arrest of Casillas. Baden testified that he warned Casillas of his rights and that Casillas made a statement. The next portion of Baden's testimony proceeded as follows:

Q. (By Mr. Walker:) Did you ask Mr. Casillas any questions?
A. Yes, sir, I did.
Q. All right, what questions did you ask Mr. Casillas?
A. I asked Mr. Casillas to whom the heroin belonged. I asked him where he was supposed to take the money to after he received it from the undercover agents. I asked him to whom the automobile belonged that he was driving.

Q. Okay.
A. I asked him if he would take us to the place and the person to whom he was to pay the money.
Q. Following this conversation that you had with Mr. Casillas, what did you do then, if anything?
A. I participated with the other agents, sir, and we went out to Moon City, about four or five vehicles, I believe, altogether, sir.

This testimony was vigorously objected to at trial. Whether or not the testimony constitutes technical hearsay, this court has been receptive to treating certain implied assertions as hearsay in order to prevent circumvention of the hearsay rule "through clever questioning and coaching of witnesses," *Park v. Huff,* 493 F.2d 923, 928 (5th Cir. 1974), *reversed on other grounds,* 506 F.2d 849 (5th Cir.) (en banc), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

In the circumstances of this case, we need not decide whether this testimony was properly admissible; we note merely that no evidence was introduced to indicate how, if at all, Casillas responded to the agent's questions. As we stated in another sufficiency case, *United States v. Martinez,* 555 F.2d 1269 (5th Cir. 1977):

If the conclusion that all hypotheses of innocence have been excluded by the evidence could be reached only as a result of speculations or assumptions about matters not in evidence, then the verdict must be overturned.

*Id.* at 1271, *citing United States v. Box,* 530 F.2d 1258, 1267 (5th Cir. 1976). *See Park v. Huff, supra,* 493 F.2d at 928. We view any inferences that might be drawn from this contested testimony as simply too speculative to be accorded weight on our review of the sufficiency of evidence against Caro.

We do not reach appellant's contention that admission of Baden's testimony, in combination with the testimony of other witnesses and the prosecutor's closing argument, amounts to a denial of constitutional rights under the confrontation and due process clauses.

address linked to Caro was located within a few blocks of the root beer stand. (5) After the arrest of Casillas, agents drove to an address indicated on documents found within the car, where one of the agents stated that he saw appellant Caro, after waving and whistling at the vehicle, turn and run into the house and disappear. The house was thoroughly searched and no males were found.

■ We are guided in our evaluation of these facts by the principles so powerfully articulated by Justice Jackson in his concurrence to *Krulewitch v. United States*, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790, 795 (1949). Justice Jackson, commenting on the then "present drift" of the "elastic, sprawling, and pervasive offense" of conspiracy, noted that

> The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.

*Id.* at 445–46, 69 S.Ct. at 720 (note omitted). The near pervasive use of conspiracy counts over the ensuing thirty years demonstrates the "tendency of a principle to expand itself to the limit of its logic." *Id.* at 445, 69 S.Ct. at 719, *citing* B. Cardozo, The Nature of the Judicial Process. Nevertheless conspiracy remains a potent and oft-used weapon in the prosecutorial arsenal. In this case a jury convicted the defendant on a conspiracy charge while acquitting on the substantive offense. There is nothing necessarily inconsistent, in law or logic, with such a result and we do not hold that a conviction for conspiracy and acquittal of the substantive offense may never properly arise from the same facts and trial. We do suggest however, that such a result should engage our judicial skepticism. A critical analysis of the facts is required when such a contrariety of results does appear. Viewing the slippery facts and the speculations necessary to uphold this conviction in this spirit, we find the syrup of proof simply too thin.

■ An essential element of the government's case is proof beyond a reasonable doubt of Caro's "agreement and knowing participation" in the conspiracy. "[M]ere association with other persons involved in a criminal enterprise is insufficient to prove participation in a conspiracy." *Barrera, supra*, at 1257, and cases cited therein. Proximity to the crime does not suffice to tip the balance. Even actual presence at the scene of the crime is not sufficient. *Id.* at 1256 and cases cited therein; *see also Gutierrez, supra*, at 1280–81. It is not enough for the government to prove that Caro might have been guilty; the government must prove, beyond a reasonable doubt, that Caro was, in fact, guilty. As we stated in *Causey v. United States*, 352 F.2d 203 (5th Cir. 1965):

> To establish the intent essential to a conviction for conspiracy the evidence of knowledge must be clear and not equivocal. A suspicion, however strong, is not proof and will not serve in lieu of proof. . . . It is true that the proof may be circumstantial or direct or both, but it must convince beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further or carry on that conspiracy.

*Id.* at 207, *quoted* in *United States v. Pruett*, 551 F.2d 1365, 1369 (5th Cir. 1977); *Gutierrez, supra*, at 1281. Viewing the evidence in the light most favorable to the government, we do not feel the government has met this standard.

Our conclusion is buttressed by a comparison of the facts of this case to our disposition of sufficiency claims in factually comparable cases. For example, in *United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974), the independent evidence offered by the government to connect Oliva with his alleged coconspirator in a conspiracy to possess and distribute cocaine was summarized by the court as follows:

> (i) appellant's presence in a crowd to which Maige [the alleged coconspirator] made an initial inquiry as to the possible purchase of cocaine; (ii) telephone rec-

ords indicating calls between numbers listed to Maige in Ft. Lauderdale and to appellant in Key West on June 27, 1972, the date of the sale; (iii) the circumstance that appellant, in the beige Cadillac, followed Maige into the parking lot adjacent to Maige's apartment shortly before the delivery of the cocaine; (iv) testimony of an Oakland Park police officer that the appellant appeared very nervous when the officer saw him in his car in the parking lot; (v) the appellant's action in driving away from the parking lot at approximately the time of Maige's arrest (characterized by the government as evidence of flight); (vi) the pistol discovered in appellant's possession upon his subsequent arrest.

497 F.2d at 133.

In assessing this evidence, the *Oliva* court stressed that no showing was made (1) that appellant and his alleged coconspirator had ever discussed between themselves the sale of the proscribed substance to the government agents, (2) that appellant ever agreed to supply his coconspirator with the proscribed substance, or (3) that appellant ever actually furnished his alleged coconspirator with the proscribed substance. Nor was the proscribed substance ever shown to be in appellant's possession. These observations are equally applicable to the case against Caro. The *Oliva* court found "[t]his meager evidence simply is not supportive of a jury finding of conspiracy." *Id.* at 134. Indeed, the evidence was viewed as insufficient to create even a prima facie case that would justify admission of hearsay testimony under the coconspirator exception. *Id.*

In another recently decided circumstantial evidence case concerning conspiracy to distribute heroin, *United States v. Gutierrez*, 559 F.2d 1278 (5th Cir. 1977), the government established that appellant's nephew and alleged coconspirator, Gonzales, made four heroin sales to a DEA undercover agent. Attempting to find Gonzales' source, DEA surveillance agents observed Gonzales go to appellant's house during the time period between Gonzales' meeting with the DEA agent to arrange the terms of sale and his return to consummate the transaction and turn over the heroin. This sequence transpired on all three occasions observed by the agents. Further, a search of appellant's home turned up $400 in marked bills that had passed from the agent to Gonzales in payment for the heroin. This court held these facts inadequate to warrant the inference

> that appellant knew of the conspiracy, much less the inference that appellant knowingly and willingly participated in it.

*Id.* at 1281. In reaching this conclusion, the *Gutierrez* court stressed that there was no *observation* of anything passing between the two, no money, no drugs, nor any package of any sort. Nor was there any *statement* made by Gonzales to anyone that he was going to visit Gutierrez in order to obtain anything. (Emphasis in original).

*Id.* Again, these facts are equally applicable to the case against Caro.

Perhaps the most damaging part of the government's case against Caro is his flight on the arrival of the 1971 Chevrolet, occupied by Casillas and undercover agents Wendt and McLees. Flight was also a factor in the *Oliva* case; there too it was not decisive. Flight alone is not enough to support a finding of guilt; as this court held in *United States v. Flores*, 564 F.2d 717 (5th Cir. 1977), while evidence of flight is "both relevant and admissible" on the issue of knowledge, "relevancy and admissibility do not equal sufficiency." *Id.* at 718. We do not believe that the evidence of Caro's flight, in the context of such other facts as were proved at trial, "raises such strong inferences of guilty knowledge that it excludes every reasonable hypothesis of innocence." *Id.* at 719. Accordingly, we reverse and set aside the judgment entered by the district court.

### Postscript

We do not view this decision, or those cited herein, as creating an impossible task for the government in what are often difficult to prove circumstantial evidence

cases. The most perfunctory examination of our recent decisions in conspiracy cases demonstrates that adequately proved convictions will be sustained. *See, e. g., United States v. Tenorio,* 565 F.2d 943 (5th Cir. 1978) (conviction sustained based in part on proof that a folded newspaper containing a package of heroin and, later, payment for the heroin, was passed from hand to hand, and was twice observed in the possession of the appellant). Still more relevant to the case at bar is the principle that the testimony of a coconspirator alone may be sufficient to support a finding that a particular defendant was a willing conspirator. *United States v. Morgan,* 562 F.2d 1001, 1003 (5th Cir. 1977); *see United States v. Iacovetti,* 466 F.2d 1147, 1153 (5th Cir. 1972), *cert. denied,* 410 U.S. 908, 93 S.Ct. 963, 35 L.Ed.2d 270. In a factually close analogue to our case, *United States v. Trevino,* 565 F.2d 1317 (5th Cir. 1978), the court noted that

> Garza's [a coconspirator's] testimony was critical in obtaining [appellant] Trevino's conviction. Although D.E.A. agents had kept the other coconspirators under surveillance and had caught them red-handed, they had observed Trevino only in an incidental manner, when four of the coconspirators stopped at an automotive shop owned by Trevino. Garza testified that he had spoken by telephone with Trevino and coconspirator Alvarez about the marijuana shipment that was subsequently foiled by the D.E.A. agents, that Trevino and Alvarez were in the deal together, and that Trevino had sent a trailer to Garza to be loaded with marijuana.

*Id.* at 1319. The court stated that "such testimony is sufficient to support a conviction." *Id.*

The force of these holdings is apparent when it is realized that in the case at bar, a writ of habeas corpus ad testificandum was issued, at the government's request, for alleged coconspirator Elias Casillas. The government characterized Casillas as "a material witness in this case . . . he is essential to the Government's case." Casillas was in government custody at the time the writ was issued and thereafter. For reasons which remain unclear, he did not appear at trial.

 We will not speculate as to what Casillas would have testified or whether his testimony, if believed, would have been sufficient to support a conviction. Without Casillas' testimony, however, the government has not proved its case. Since the instant appeal is from the denial of appellant's motion for acquittal, and the Record reveals that appellant made no motion for a new trial, appellant's conviction is reversed and the case remanded to the trial court with directions to enter a judgment of acquittal. *United States v. Brumley,* 560 F.2d 1268 (5th Cir. 1977); *United States v. Musquiz,* 445 F.2d 963, 966 (5th Cir. 1971).

REVERSED and REMANDED.